IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 19-00266-01-CR-W-RK ) |
| RAIMON MARTEZ GILLIAM, | ) ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

This matter is currently before the Court on Defendant Raimon M. Gilliam's pro se Motion to Suppress Evidence After Unlawful Arrest filed on September 15, 2021. Doc. 95. The Government filed Suggestions in Opposition on October 6, 2021. Doc. 103. On October 21, 2021, Defendant filed his Reply. Doc. 111. For the reasons set forth below, it is recommended that Defendant's Motion to Suppress be **DENIED**.

### I. PROCEDURAL BACKGROUND

On August 7, 2019, the grand jury returned a twelve-count indictment charging Defendant Gilliam with one count of conspiracy to distribute a controlled substance, seven counts of distribution of heroin, and four counts of possession of a firearm in furtherance of a drug trafficking crime. Doc. 1. After Defendant's initial appearance on August 27, 2019, the Court appointed the Federal Public Defender's Office to represent him. Doc. 8. Defendant was arraigned on August 30, 2019, and this matter was set for trial on October 28, 2019. Doc. 17.

On September 10, 2019, defense counsel Bob Kuchar filed a motion to continue the trial. Doc. 19. The following day, the Court granted the motion and continued the trial to April 20, 2020. Doc. 20. The Court entered a Scheduling and Trial Order, which set December 2, 2019 as

the deadline to file all pretrial motions. *Id.* at 9. On April 1, 2020, the Court granted a motion to continue filed by Codefendant Ervin Lynn Ross[1] setting the trial for September 14, 2020. Docs. 25-26. On August 24, 2020, counsel for Defendant moved to continue the trial. Doc. 30. The Court granted the motion and set this matter on the November 30, 2020 Joint Criminal Trial Docket. Doc. 31.

On October 27, 2020, Mr. Kuchar filed a motion to withdraw as Defendant's counsel. Doc. 36. Two days later, the Court received a letter from Defendant requesting appointment of substitute counsel or, alternatively, to permit him to proceed pro se. Doc. 38. On November 3, 2020, the Court held an attorney appointment hearing. Doc. 39. Based on the discussions at the hearing, the Court granted Mr. Kuchar's motion to withdraw and appointed CJA counsel David Johnson to represent Defendant. Docs. 39-41.

On November 6, 2020, Mr. Johnson moved to continue the trial. Doc. 43. The Court granted the request and continued the trial to February 8, 2021. Doc. 44. Due to the COVID-19 pandemic, the Court issued General Orders on December 1, 2020, and February 1, 2021, which ultimately continued all criminal trials until May 3, 2021. Docs. 53, 56. Accordingly, this matter was reset for trial on the May 3, 2021 Joint Criminal Jury Trial Docket. *Id*.

On April 8, 2021, defense counsel filed a motion to continue. Doc. 61. The Court granted the motion and set this matter for trial on June 7, 2021. Docs. 63-64. On May 17, 2021, defense counsel filed another motion to continue. Doc. 67. On May 18, 2021, the Court granted the motion and continued this matter to July 12, 2021. Doc. 69. On June 16, 2021, defense counsel filed yet another motion to continue. Doc. 75. The Court granted the motion and continued the trial to September 20, 2021. Doc. 76.

---

[1] Codefendant Ross entered a plea of guilty on September 16, 2020, and was sentenced on December 14, 2020. Docs. 33, 50-51.

On July 9, 2021, the Court received a letter from Defendant requesting to proceed pro se. Doc. 77. A *Faretta*[2] hearing was held on July 20, 2021, and after formal inquiry, the Court entered an order finding Defendant knowingly and voluntarily waived his right to counsel, and granted his request to proceed pro se. Docs. 79-80. On August 2, 2021, Defendant filed a pro se motion to extend the pretrial motion deadline.[3] Doc. 83. On August 13, 2021, he filed a pro se motion to continue the trial. Doc. 86. On August 18, 2021, the Court granted Defendant's motion to continue and set this matter for trial on December 6, 2021. Doc. 87. On August 23, 2021, the Court granted Defendant's motion to extend the pretrial motion deadline.[4] Doc. 91.

On September 15, 2021, Defendant filed the pending pro se Motion to Suppress. Doc. 95. The motion challenges his June 18, 2018 arrest. *Id*. at 1. Specifically, Defendant argues there was a working relationship between federal agents and local law enforcement who investigated him between February 2018 and June 2018. *Id*. at 7-12. He further contends he was never independently identified until his arrest, and his arrest was not supported by probable cause. *Id*. Defendant maintains his arrest was solely for investigative purposes, and Rule 5(a) of the Federal Rules of Criminal Procedure was violated. *Id*. Accordingly, he argues all evidence seized "from [his] person incident to his arrest on June 18, 2018, including actual physical evidence like clothing, identification, photographic evidence and testimonial evidence regarding such items" should be suppressed. *Id*. at 3-12.

This matter was initially set for an evidentiary hearing on October 15, 2021. Doc. 102. However, on October 12, 2021, the Court received a motion from Defendant requesting to continue

---

[2] *Faretta v. California*, 422 U.S. 806 (1975).

[3] As stated *supra*, the Court's Scheduling and Trial Order set December 2, 2019 as the deadline for filing all pretrial motions. Doc. 20. There was no previous request to extend the deadline, nor were any pretrial motions filed on Defendant's behalf.

[4] The Government did not file suggestions in opposition to Defendant's pro se motion to extend the pretrial motion deadline. *See* L.R. 7.0(c)(2).

the evidentiary hearing and a separate letter from Defendant advising of his difficulties with reviewing discovery and preparing for the hearing. Docs. 104-05. In light of Defendant's statements therein, the Court set a status conference for November 4, 2021. Doc. 109. At the status conference, the parties discussed Defendant's access to discovery and hearing preparation. *Id*. Defendant also orally moved to continue the trial. *Id*. Based on the undersigned's discussion with the Government and Defendant, the Court granted Defendant's requests to continue the evidentiary hearing and the trial. Docs. 109-10. The trial was continued to March 21, 2022. Doc. 110.

On December 13, 2021, the undersigned held an evidentiary hearing on Defendant's Motion to Suppress. *See* Docs. 119, 123. Mr. Gilliam was present in person, representing himself. The Government was present and represented by Assistant United States Attorney Brad Kavanaugh. At the evidentiary hearing, two witnesses testified: Special Agent Dillon Phillips and Detective Joshua Davis. Additionally, two exhibits were admitted into evidence. Docs. 120-21.

## II. FINDINGS OF FACT

Based on the evidence adduced at the evidentiary hearing, the undersigned submits the following:

1. Since May 2020, Dillon Phillips, a special agent with nine years' experience in law enforcement, has worked with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). Tr.[5] at 5-6. He is currently assigned to the Field Office in Oakland, California. Tr. at 5-6.

2. Prior to joining the ATF, Agent Phillips was employed by the Kansas City, Missouri Police Department ("KCPD") for eight years. Tr. at 6. For three of those years, he was an undercover narcotics detective with the Street Crimes Unit. Tr. at 6-7. As an undercover

---

[5] "Tr." refers to the Transcript of Hearing on Motion to Suppress filed December 17, 2021. Doc. 123.

detective, Agent Phillips worked with confidential informants ("C.I.") and purchased controlled substances. Tr. at 7.

3. In February 2018, Agent Phillips, through his employment with KCPD, began an investigation of Defendant for heroin trafficking. Tr. at 7. Specifically, a C.I. advised the agent that Defendant, who went by the moniker "Money," was trafficking black tar heroin in the Kansas City metropolitan area. Tr. at 8, 31-32. The C.I. also provided Defendant's telephone number and Facebook page. Tr. at 8. The Facebook page bore the name "ThirdWall Shotta" and reflected a photograph of Defendant. Tr. at 8-9.

4. While Agent Phillips was discussing his investigation with a Federal Bureau of Investigations ("FBI") agent, another FBI agent, Brad Hershberger, overheard the discussion. Tr. at 9. He recognized Defendant's name and picture. Tr. at 9, 81-82. When presented with the Facebook picture and the nickname Money, Agent Hershberger identified the individual as Defendant. Tr. at 9-10, 81-82.

**Controlled Buys**

5. Agent Phillips arranged for the C.I. to purchase black tar heroin from Defendant on February 26, 2018. Tr. at 10. The C.I. contacted Defendant and asked to purchase one gram of black tar heroin. Tr. at 10, 32. Defendant instructed the C.I. to meet at an apartment building located at 5304 East 12th Street, Kansas City, Missouri. Tr. at 10-11, 32.

6. Agent Phillips and the C.I. arrived at the location, and a short time later, Defendant exited the back door of the apartment building, and motioned for the C.I. to walk up to the building. Tr. at 11, 32. Agent Phillips had a good view of the C.I. and the Defendant. Tr. at 32. The C.I. exited the vehicle, met Defendant at the back of the apartment building, and received black tar heroin from Defendant. Tr. at 11, 32. When the C.I. returned to the vehicle, Agent Phillips gave him $140, and the CI returned to the Defendant to pay him the money. Tr. at 11-12, 32. The

5

substance was later submitted to the Kansas City, Missouri Crime Lab ("Crime Lab") and tested positive for 1.0266 grams of heroin. Tr. at 12.

7. After the February 26, 2018 transaction, the KCPD Drug Enforcement Unit and the FBI joined the Street Crimes Unit in investigating Defendant for drug trafficking. Tr. at 13, 35, 48-49. KCPD Detective Joshua Davis was one of the individuals who joined the investigation. Tr. at 45-47, 78. Detective Davis, who has more than twenty-five years of law enforcement experience, is also a task force officer with the FBI. Tr. at 45-46, 79.

8. On February 27, 2018, Agent Phillips was presented a photo lineup of six individuals. Tr. at 13, 33, 40; Gov't Ex. 1. The lineup was prepared and presented by a civilian employed with the KCPD Intelligence Analyst Unit. Tr. at 13, 33, 40; Gov't Ex. 1. From the lineup, Agent Phillips positively identified Defendant by circling the second photo and writing his initials, serial number, and the date and time. Tr. at 13-14, 33, 83; Gov't Ex. 1.

9. On February 28, 2018, Agent Phillips contacted Defendant to purchase one gram of black tar heroin. Tr. at 15. Defendant instructed the agent to meet him at the intersection of East 33rd Street and Benton Boulevard in Kansas City, Missouri. Tr. 15. Agent Phillips arrived at the location, and shortly thereafter, a gold Ford Escape arrived. Tr. at 15, 50.

10. The agent exited his vehicle and entered the front passenger's seat of the Ford Escape. Tr. at 15. Defendant was the only occupant of the Escape. Tr. at 16. Agent Phillips observed a black AK-style rifle with a black pistol grip and no stock on Defendant's lap. Tr. at 16.

11. Agent Phillips paid Defendant $140 and received approximately 1.2 grams of black tar heroin. Tr. at 16. The transaction was captured on audio and video recordings. Tr. at 16-17. The Crime Lab analyzed the substance which tested positive for .9479 grams of heroin. Tr. at 16.

6

12. On March 5, 2018, Agent Phillips contacted Defendant to purchase 3.5 grams of black tar heroin. Tr. at 17. Defendant asked the agent to meet him at Burger King located at 4351 Blue Parkway, Kansas City, Missouri. Tr. at 17. When the agent arrived at the location, a gold Ford Escape also arrived. Tr. at 17, 50. The agent entered the Ford Escape, where he observed Defendant and two others inside. Tr. at 19. Defendant had a black Glock handgun in his lap. Tr. at 19. Agent Phillips paid Defendant $420, and in return, received approximately 3.9 grams of black tar heroin. Tr. at 19. The transaction was audio and video recorded. Tr. at 23. The Crime Lab tested the substance, which consisted of 3.6737 grams of heroin. Tr. at 19-20.

13. Following this transaction, Agent Phillips was presented with another photo lineup. Tr. at 20. From this lineup, the agent positively identified the individual sitting in the Ford Escape front passenger seat during the March 5, 2018 transaction as Codefendant Ervin Lynn Ross. Tr. at 20.

14. On March 12, 2018, Agent Phillips contacted Defendant to purchase 3.5 grams of black tar heroin. Tr. at 20. Defendant directed the agent to Gates Bar-B-Q located at 1325 Emmanuel Cleaver Boulevard, Kansas City, Missouri. Tr. at 20. Upon arriving at Gates, the agent was instructed to meet Defendant at a gas station located at 2601 Swope Parkway, Kansas City, Missouri. Tr. at 20.

15. Once at the gas station, Agent Phillips observed the gold Ford Escape arrive with Codefendant Ross driving, and Defendant riding in the front passenger seat. Tr. at 21, 50. There were also two females in the back seat. Tr. at 21, 50. Agent Phillips entered the back seat of the Ford Escape, provided Defendant with $420, and received 3.5 grams of black tar heroin in return. Tr. at 22.

16. After the transaction, Agent Phillips spoke with Defendant at the passenger's side window and observed a black Glock-style brand handgun in his lap. Tr. at 22. The transaction

7

was captured by audio and video recordings. Tr. at 23. The Crime Lab later confirmed Agent Phillips received 3.6472 grams of heroin. Tr. at 22-23.

17. On April 19, 2018, Agent Phillips contacted Defendant to purchase 3.5 grams of black tar heroin. Tr. at 23. Defendant asked the agent to meet him at the McDonald's restaurant near Truman Road. Tr. at 23. Upon the agent's arrival, he observed marked patrol vehicles in the area and contacted Defendant to advise him of the same. Tr. at 23. At that point, Defendant directed Agent Phillips to the apartment building where the agent first observed Defendant on February 26, 2018. Tr. at 23-24, 50-51.

18. When the agent arrived at the apartment building, he notified Defendant of his arrival. Tr. at 24. Defendant exited the back door with a black Glock brand handgun in his right front pants pocket. Tr. at 24. Agent Phillips provided Defendant $420 in exchange for 3.8 grams of black tar heroin. Tr. at 24. Defendant advised the agent that if he knew of others wishing to purchase black tar heroin, they could contact Defendant. Tr. at 25. This transaction was audio and video recorded. Tr. at 25. The Crime Lab later analyzed the substance, which tested positive for 3.6520 grams of heroin. Tr. at 24-25.

19. On April 25, 2018, Agent Phillips contacted Defendant seeking to purchase $250 worth of heroin. Tr. at 25. In response, Defendant said he would sell two grams of heroin for that price and instructed the agent to meet him back at the apartment building. Tr. at 25, 51. Agent Phillips arrived at the apartment building, notified Defendant, and a short time later, made contact with him. Tr. at 25-26. The agent gave Defendant $250 in exchange for approximately two grams of black tar heroin. Tr. at 26. The transaction was audio and video recorded. Tr. at 26. According to the Crime Lab, the substance contained 2.0177 grams of heroin. Tr. at 26.

20. On May 24, 2018, Agent Phillips again contacted Defendant to purchase two grams of black tar heroin. Tr. at 26. Defendant advised the agent that two grams would now cost $300

8

Case 4:19-cr-00266-RK   Document 130   Filed 02/08/22   Page 8 of 18

because he had acquired new product. Tr. at 26-27. Defendant directed Agent Phillips to meet him at the same apartment building. Tr. at 27. Once they made contact, Defendant sold the agent 2.1 grams of black tar heroin in exchange for $300. Tr. at 27, 51. The substance was later submitted to the Crime Lab where it tested positive for 2.0058 grams of heroin. Tr. at 27, 51.

21. On June 18, 2018, at approximately 3:41 p.m., Agent Phillips contacted Defendant to purchase two grams of black tar heroin. Tr. at 27-28. Defendant directed the agent to return to the apartment building, and the agent arrived at approximately 3:55 p.m. Tr. at 28, 51. At approximately 4:00 p.m., the agent paid Defendant $280 for approximately two grams of black tar heroin. Tr. at 28. The transaction was audio and video recorded. Tr. at 29. The substance was later submitted to the Crime Lab where it tested positive for 1.9654 grams of heroin. Tr. at 28-29.

22. In total, Agent Phillips purchased more than eighteen grams of black tar heroin for $2,370 during the controlled buys from Defendant. Tr. at 30. During all transactions between Defendant and Agent Phillips, other officers, including Detective Davis, conducted surveillance. Tr. at 29. During the last seven transactions, members of KCPD's Drug Enforcement Unit and the FBI were also present.[6] Tr. at 29, 41, 79-80.

**Defendant's Arrest**

23. On June 18, 2018, law enforcement decided to arrest Defendant for distribution of controlled substances. Tr. at 34, 52. Officers surrounded the apartment building, and Detective Davis was positioned to the south. Tr. at 34, 52. After the transaction between Defendant and Agent Phillips, a red Ford Mustang, which Detective Davis immediately recognized as belonging to a known narcotics trafficker, Sheri Clark, arrived at the apartment building. Tr. at 53.

---

[6] KCPD's Drug Enforcement Unit and the FBI assisted with surveilling the apartment building. Tr at 54-55. The FBI agents were present to assist with the investigation. Tr. at 54. As of June 18, 2018, the matter remained a state investigation. Tr. at 54-55, 80.

24. The Mustang's occupants exited the vehicle and entered the apartment building. Tr. at 56. After a brief moment, the same individuals left the building with Defendant who was carrying a backpack.[7] Tr. at 56, 64-65. Defendant left in the Mustang with Tommy Simmons, III, and A'Sean Everette, who were both identified by Detective Davis.[8] Tr. at 53-57.

25. Law enforcement made the decision to follow the vehicle to conduct a traffic stop. Tr. at 56-57. The Mustang was followed to Prospect Avenue, at which point Detective Davis requested the tactical squads conduct a car stop and place Defendant under arrest for distribution of a controlled substance. Tr. at 57. When law enforcement activated their lights and sirens, the Mustang took off at a high rate of speed. Tr at 57. The officers discontinued the chase because it was around four or five o'clock in the evening. Tr. at 57.

26. Detective Davis instructed surveillance crews to go to three locations associated with Defendant. Tr. at 57. Detective Eddie Caballero went to a partially boarded-up and abandoned residence at 3315 Benton Boulevard. Tr. at 57-58. Detective Davis went to 38th and Wabash. Tr. at 58. Other law enforcement officers went to the area of 43rd Terrace where Sheri Clark lives. Tr. at 58.

27. Upon arriving at the residence at 3315 Benton Boulevard, Detective Caballero observed the red Mustang parked in the back of the driveway. Tr. at 58-59. He also saw Defendant, Everette, and Simmons walk between the houses and get into a white Chevrolet Malibu that had just arrived. Tr. at 59-60. The Malibu then left the residence. Tr. at 59-60. Members of the surveillance and tactical crews followed the Malibu to another location while other crews

---

[7] In a previous shooting investigation, a backpack containing heroin was recovered from the trunk of a car occupied by Defendant, Codefendant Ross, and another individual. Tr. at 56.

[8] Detective Davis was familiar with Simmons, Everette, and Defendant through past narcotics investigations surrounding the Clark and Simmons families. Tr. at 55-57, 78-79, 83.

remained at the 3315 Benton Boulevard residence to check the red Mustang and ensure there were no other individuals present. Tr. at 60.

28. Law enforcement stopped the Malibu at approximately 5:10 p.m. Tr. at 60. The occupants of the Malibu – Defendant, Everette, Simmons, and an individual named Williams – were arrested and placed on a twenty-four-hour hold.[9] Tr. at 60-61. The approval to arrest the individuals and place them on a twenty-four hold was given by Sergeant Paul Hamilton, who was a supervisor in the KCPD Drug Enforcement Unit. Tr. at 61.

29. The individuals, including Defendant, were searched incident to arrest. Tr. at 62. No items of contraband were discovered. Tr. at 62. There was nothing of evidentiary value recovered from the search incident to arrest of Defendant. Tr. at 62. The individuals were transported to the East Patrol Station for booking.[10] Tr. at 62.

30. After the booking process, the four individuals were transported to the Jackson County Detention Center located at 13th and Cherry Street. Tr. at 70, 80. Because he was participating in the canvassing and inventorying of the vehicles, Detective Davis was not able to interview the individuals on the day they were arrested. Tr. at 70.

31. On June 19, 2018, Detective Davis and Agent Hershberger from the FBI interviewed the four individuals at the Jackson County Detention Unit.[11] Tr. at 71-72, 80-81. Because of limited resources, the process of requesting and obtaining individuals for interviews was prolonged, and the interviews occurred in an office at the detention facility. Tr. at 71-72.

---

[9] *See* Mo. Rev. Stat. § 544.170 (defining a twenty-four "hold" ).

[10] The booking process, which takes approximately twenty to thirty minutes, involves taking a suspect's fingerprints, photographs, and name. Tr. at 63, 68-69. Law enforcement also runs the suspect's information to determine if there are any outstanding warrants. Tr. at 63, 68-69. As soon as the booking process is completed, the arrestees are usually transported to the detention facility in Jackson County. Tr. at 63.

[11] According to Detective Davis, Agent Hershberger was present for the interviews as a "courtesy." Tr. at 81. Agent Davis again confirmed the investigation was a KCPD investigation. Tr. at 81.

32. At 12:55 p.m. Defendant was escorted to the interview room. Tr. at 74. He was advised of his *Miranda* rights and agreed to answer biographical questions. Tr. at 74, 77. Thereafter, Defendant informed Detective Davis that he did not wish to speak with him. Tr. at 74. He was returned to the detention unit at approximately 1:10 p.m. Tr. at 74. Detective Davis advised the detention facility's officers that Defendant was to be released pending further investigation. Tr. at 75-77.

33. Ultimately, Detective Davis learned that Defendant was released from the Jackson County detention facility at approximately 3:49 p.m. Tr. at 76. Other than biographical information, Defendant did not make any statements to law enforcement. Tr. at 77. None of Defendant's clothing was retained as evidence. Tr. at 77. No other items, including contraband, were recovered from Defendant following his arrest. Tr. at 77. Defendant was released pending further investigation and was not charged with any criminal offenses on June 18 or 19, 2018.

### III. DISCUSSION

Defendant moves to suppress all evidence and testimony related to such evidence obtained from the search of his person incident to arrest on June 18, 2018. Doc. 95 at 1. Defendant mentions "identification, photographs, clothing and testimonial evidence" in his motion; however, no such items were obtained from Defendant as a result of his arrest on June 18, 2018.

Although the relief Defendant seeks is unclear, the undersigned will address the three arguments Defendant raises in his motion. *See* Doc. 95. First, he argues he was not independently identified until his arrest. *Id*. at 11. Second, he contends his arrest was not supported by probable cause, and it was solely for "investigative purposes." *Id*. And last, Defendant alleges Rule 5 of the Federal Rules of Criminal Procedure was violated because he was not brought before a magistrate judge when he was initially arrested. *Id*. at 7, 10-12.

A. **Defendant's Identification**

Defendant contends he was not "independently reliably identified" until his arrest on June 18, 2018. Doc. 95 at 11. The evidence established, however, that Defendant was identified by law enforcement prior to the first heroin purchase. He was also identified by the undercover officer soon after the first undercover purchase of heroin. First, Special Agent Hershberger, who was already familiar with Defendant, recognized the moniker "Money" and the Facebook photograph to be Defendant when Detective Phillips was discussing the case with other law enforcement officers.[12] The second identification of Defendant occurred through a photograph array shown to Detective Phillips after the first undercover purchase of heroin. The photograph array was prepared by a civilian employed by KCPD's the Intelligence Analyst Unit and depicted six individuals. Agent Phillips then independently identified Defendant based on his previous observations of Defendant.

With regard to the Facebook photograph identified by Agent Hershberger, there was nothing inherently suggestive or prejudicial with that process. Agent Hershberger was already familiar with Defendant. The Eighth Circuit has held that when a witness who is already familiar with a suspect is asked to comment on whether an image portrays the suspect, the concerns that an improper lineup or photo array may be unduly suggestive or prejudicial are simply absent. *United States v. Dobbs*, 449 F.3d 904, 909-10 (8th Cir. 2006); *see also United States v. Omar*, 786 F.3d 1104, 1110 (8th Cir. 2015) (recognizing that because witnesses were already familiar with the defendant, the identification technique of showing photos did not create a substantial likelihood of misidentification).

---

[12] Defendant raised no discernable argument with either the initial identification by Agent Hershberger or the photograph arrays presented to Agent Phillips.

13

With regard to the photo array shown to Detective Phillips, courts typically use a two-step analysis to determine whether an identification is unreliable. *United States v. Daly*, 488 F.3d 796, 803 (8th Cir. 2007) (citing *United States v. Martin*, 391 F.3d 949, 952 (8th Cir. 2004)). First, the defendant bears the burden of proving the photograph arrays shown were "impermissibly suggestive." *Id*. Second, if said arrays are found to be "impermissibly suggestive," then the court must inquire "whether, under the totality of the circumstances of the case, the suggestive confrontation created a very substantial likelihood of irreparable misidentification." *Id*. When a witness is shown an improper photograph array, "undue suggestiveness may be prejudicial because the suggestiveness may cause the eyewitness to falsely recollect the face of the person who committed the offense." *Dobbs*, 449 F.3d at 910 (citation omitted). This concern is absent, however, when "someone already familiar with a suspect is asked to comment on whether a[n] . . . image portrays the suspect." *Id*.

Here, the defendant did not meet his burden of showing or proving that the photo array was impermissibly suggestive. Further, there is no evidence the photo array created a substantial likelihood of irreparable misidentification. Detective Phillips was already familiar with Defendant from the Facebook photos and the first undercover transaction when he clearly viewed Defendant. Accordingly, the undersigned recommends a finding that each of Defendant's identifications prior to his arrest on June 18, 2018 was proper.

**B.     Probable Cause**

The Fourth Amendment specifically provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. A warrantless arrest does not violate the Fourth Amendment if it is supported by probable cause. *Royster v. Nichols*, 698 F.3d 681, 687-88 (8th Cir. 2012). "To determine whether an officer had probable cause to arrest an individual, we examine the events

14

leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citation and internal quotation omitted); *see also United States v. Kelley*, 329 F.3d 624, 628 (8th Cir. 2003).

"An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *United States v. Chappell*, 779 F.3d 872, 877 (8th Cir. 2015) (quoting *United States v. Torres-Lona*, 491 F.3d 750, 755 (8th Cir. 2007)). Notably, probable cause is not a "high bar." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018); *United States v. Edwards,* 891 F.3d 708, 711 (8th Cir. 2018). In Missouri, a person "commits the offense of delivery of a controlled substance if . . . he or she knowingly distributes or delivers a controlled substance." Mo. Rev. Stat. § 579.020.1(1).

In the instant matter, Defendant's June 18, 2018 arrest was supported by probable cause. On at least eight prior occasions, Defendant sold Agent Phillips black tar heroin in exchange for cash. Every transaction was audio and video recorded. Furthermore, other law enforcement officers were present and conducting surveillance of each transaction. And on four separate occasions, Agent Phillips observed Defendant in possession of a firearm on his person while conducting drug transactions.

Generally, an officer's observation of a controlled drug buy provides probable cause to arrest an individual without a warrant. *See United States v. Baldenegro-Valdez*, 703 F.3d 1117, 1125 (8th Cir. 2013); *United States v. Webster*, 625 F.3d 439, 442-43 (8th Cir. 2010). Here, law enforcement observed multiple controlled drug buys between an undercover agent and Defendant. Thus, there were sufficient facts to lead a reasonable person to believe Defendant had committed,

15

Case 4:19-cr-00266-RK   Document 130   Filed 02/08/22   Page 15 of 18

or was committing, a crime. Accordingly, the undersigned recommends a finding that Defendant's June 18, 2018 arrest was supported by probable cause.

C. **Federal Rule of Criminal Procedure 5**

The Federal Rules of Criminal Procedure provide, "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge." Fed. R. Crim. P. 5(a)(1)(A). "Rule 5(a) applies only to persons arrested and held under federal law." *United States v. Cooke*, 853 F.3d 464, 470 (8th Cir. 2017) (quoting *United States v. Elliott*, 435 F.2d 1013, 1015 (8th Cir. 1970)). Rule 5 does not apply where a defendant "has been arrested by local authorities and is in their sole custody." *Cooke*, 853 F.3d at 470. Instead, Rule 5(a) only applies after a defendant is taken into federal custody. *United States v. Young*, Case No. 18-00175-01-CR-W-DGK, 2020 WL 593801 at *2 (W.D. Mo. Jan. 22, 2020).

The rule's purpose is to "frustrate law-enforcing officers from detaining the arrested person for an unnecessary period of time to enable the officer to extract a confession from the arrested individual." *United States v. Morris*, 445 F.2d 1233, 1236 (8th Cir. 1971). But this principle is not applicable when the arrestee is "in the custody and under the control of local and not federal officers, unless, of course, the state officers are acting at the direction of or in concert with the federal officers . . . ." *Id.* (citing *Grooms v. United States*, 429 F.2d 839, 842-43 (8th Cir. 1970)). Absent an arrest by federal authorities, Rule 5 may only apply if "there is evidence indicating that the arrest and detention by the state official were at the request of federal authorities or for the purpose of assisting them." *United States v. Jarrett*, 423 F.2d 966, 971 (8th Cir. 1970) (citing *Tucker v. United States*, 375 F.2d 363, 370 (8th Cir. 1967)).

Defendant argues that because there was a "working relationship" between federal and local law enforcement, Rule 5 was violated when he was not promptly brought before a magistrate

16

judge after his arrest.[13] Doc. 95 at 10-11. However, there is no evidence of improper collaboration or collusion between federal and state officers in this case. Although present for surveillance and interviews, there is no evidence federal agents led this investigation or made investigatory decisions through the Defendant's arrest on June 18, 2018. Nor is there evidence that the arrest was made at the request of federal authorities or to assist the federal authorities in prosecuting the Defendant in federal court as of June 18, 2018.

This investigation involved an undercover officer with the Kansas City Missouri Police Department. The KCPD Drug Enforcement Unit coordinated and led the investigation. The case at that time was identified as a state case. A supervisor in the Drug Enforcement Unit authorized the arrest of Defendant under the state twenty-four hour hold law. After his arrest, the Defendant was taken to a KCPD police station, and then later to the Jackson County Detention Center. Through the time of Defendant's arrest, the matter had not been referred for review by a federal prosecutor. There were no federal charges filed as of Defendant's release on June 19, 2018.[14] Defendant was in KCPD's custody and was released less than twenty-four hours after his arrest.[15] Defendant was never in federal custody, and therefore, the Rule 5(a) requirements did not attach.

---

[13] Defendant relies on *United States v. Roberts*, 928 F. Supp. 910 (W.D. Mo 1996) to support his argument, but this is improper. Doc. 95 at 7-8. In *Roberts*, the defendant was detained without probable cause by state law enforcement agents acting at the direction of the federal prosecutor. *Roberts*, 928 F. Supp. at 938. The Court, adopting the Report and Recommendation from Judge Robert Larsen, found "the arrest of [the] defendant pursuant to the Missouri 20-hour hold law was an unlawful pretext for investigative purposes, and that the government intentionally circumvented procedure in place to protect [the] defendant's constitutional rights." *Id*. In the instant case. as discussed *supra*, Defendant's arrest was supported by probable cause, and any period of detention in which Defendant was undergoing the standard "booking procedures" was reasonable. Furthermore, state law enforcement officers were acting on their own investigation, and not at the direction of a federal prosecutor or a federal agent. Accordingly, *Roberts* is easily distinguishable from the case presented here.

[14] Defendant was charged by federal indictment on August 7, 2019, which was over a year after his arrest and release pending further investigation on June 19, 2018. *See* Doc. 1.

[15] Missouri law allows for a twenty-four-hour detention period following a warrantless arrest. *See* Mo. Rev. Stat. § 544.170. This statute provides that "[a]ll persons arrested and confined in any jail or other place of confinement by any peace officer, without warrant or other process, for any alleged breach of the peace or other criminal offense, or on suspicion thereof, shall be discharged from said custody within twenty-four hours from the time of such arrest, unless they shall be charged with a criminal offense . . . ." *Id.*

Even assuming, *arguendo*, there was a Rule 5 violation when Defendant was not promptly presented to a magistrate judge, the undersigned would still recommend denial of Defendant's motion. The appropriate remedy available to the Court for a Rule 5 violation would be suppression of evidence obtained as a result of the violation. *See Cooke*, 853 F.3d at 471. Here, there is no such evidence. As discussed *supra*, Defendant refused to make any statements to law enforcement other than his biographical information. Furthermore, no other statements or items of evidentiary value were obtained from Defendant, and therefore, there is nothing for the Court to suppress if a Rule 5 violation had in fact occurred.

The undersigned recommends a finding that there was no violation of Rule 5 of the Federal Rules of Criminal Procedure after Defendant's arrest on June 18, 2018 and his release on June 19, 2018.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant's pro se Motion to Suppress. Doc. 95.

Counsel for the Government and Defendant are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation except on the grounds of plain error or manifest injustice.

DATE: February 8, 2022          /s/ W. Brian Gaddy
                                W. BRIAN GADDY
                                UNITED STATES MAGISTRATE JUDGE